**UNITED STATES DISTRICT COURT**

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NICKOLAS W. McMAHON,<br><br>Plaintiff,<br><br>v.<br><br>CAROLYN W. COLVIN, Acting Commissioner of Social Security,<br><br>Defendant. | Case No. 1:15-cv-00043-SMS<br><br>ORDER AFFIRMING AGENCY'S DENIAL OF BENEFITS |

Plaintiff Nickolas W. McMahon seeks review of a final decision of the Commissioner of Social Security ("Commissioner") denying his applications for disability insurance benefits ("DIB") under Title II and for supplemental security income ("SSI") under Title XVI of the Social Security Act (42 U.S.C. § 301 *et seq.*) ("the Act"). This matter is before the Court on the parties' cross-briefs, which were submitted without oral argument to the Magistrate Judge. Following a review of the record and applicable law, the Court affirm the decision of the Administrative Law Judge ("ALJ").

I. PROCEDURAL HISTORY AND FACTUAL BACKGROUND[1]

A.  *Procedural History*

---

[1] The relevant facts herein are taken from the Administrative Record ("AR").

1

Plaintiff applied for DIB on October 13, 2011, alleging disability beginning on July 18, 2008. He also applied for SSI on December 17, 2012.[2] The Commissioner denied Plaintiff's claims on January 5, 2012, and upon reconsideration on August 21, 2012. AR 60, 75, 128. Plaintiff then requested a hearing before an ALJ. AR 89.

On January 22, 2013, Plaintiff appeared and testified before ALJ Raymond L. Souza. Also at the hearing were Plaintiff's counsel and an impartial vocational expert ("VE"). AR 29. In a written decision dated May 24, 2013, the ALJ found Plaintiff was not disabled under the Act. AR 24. On November 4, 2014, the Appeals Council denied review of the ALJ's decision, which thus became the Commissioner's final decision, and from which Plaintiff filed a timely complaint. AR1; Doc. 1.

B. *Factual Background*

The Court will not recount in detail all the facts of this case, discussing only what is relevant to this appeal.

1. Medical Evidence

Plaintiff's conditions stemmed from a work injury which occurred on July 18, 2008. While hooking up a car to be towed, his right lower leg was struck by a vehicle. Upon being admitted to the emergency room at Community Hospital of Los Gatos, he complained of lower right leg pain but denied injury elsewhere. Examinations showed a normal right knee without fractures, aside from swelling and tenderness to the calf area and a minor contusion of the anterior ankle joint. Plaintiff was discharged home and prescribed pain medication. AR 217-218.

The breadth of Plaintiff's medical history thereafter show him receiving treatment from physicians at the Los Gatos Spinal Diagnostics, South Bay Pain and Rehab Medical Group ("South Bay Pain and Rehab"), and Sierra Acupuncture.

For about three years, from January 2009 to April 2012, Plaintiff saw Brian Karvelas, M.D.

---

[2] The ALJ's written decision states Plaintiff applied for SSI on December 17, 2012 and the parties' briefs cite to it, but the AR contains no documents reflecting Plaintiff applied for SSI.

of South Bay Pain and Rehab on almost a monthly basis.  AR 282-290, 292-314, 358, 473.  At their first consultation, Plaintiff discussed his work injury and reported having a severe headache, lower back pain, and right greater than left leg pain the morning after the accident.  He reported seeking treatment for the pain and received more than one course of physical therapy.   While the last course of physical therapy was helpful, the pain persisted.  Dr. Karvelas made the following diagnostic impressions: (1) L5-S1 intervertebral disc annular tear and protrusion causing mild spinal canal stenosis and bilateral neural foraminal stenosis, symptomatic with lumbosacral radiculopathy; (2) cervical strain injury versus intervertebral disc injury and/or spondylosis with associated headache disorder; and (3) improved right knee and ankle contusion.  Dr. Karvelas requested authorization for a cervical spine MRI to evaluate for an intervertebral disc injury which might explain the ongoing neck pain symptoms and headache disorder.  He recommended enrolling Plaintiff in a physical therapy program to address Plaintiff's cervical spine condition.  He restricted Plaintiff to light duty and recommended he remain on temporary disability for at least several months.  AR 316-323.

In October 2009, David K. Pang, M.D., evaluated Plaintiff for purposes of his workers' compensation claim.  Dr. Pang observed: (1) "no visible muscular atrophy of the muscles of the upper or lower extremities[;]" (2) "no visible thenar, hypothenar or intrinsic muscle atrophy of the muscles of either hand[;]" (3) "gait was normal and reciprocating [and] [Plaintiff] could heel and toe walk normally, although he complained of some pain in his lower back when he did so[;]" (4) motor testing of the  major motor groups of the upper and lower extremities were normal; (5) sensory testing of the major sensory dermatomes of the upper and lower extremities were normal, except for "[d]iminished sensation over the lateral aspect of his left lower leg."  Dr. Pang noted chronic cervical and trapezial strain, chronic lumbar strain, and left leg pain.  Objective findings included: "[r]ight and left paralumbar muscular tenderness and guarding; decreased cervical and lumbar spine motion; and decreased sensation of the left and lateral calf."  In conclusion, Dr. Pang did not believe Plaintiff

could return to his prior occupation in full capacity and "would be considered medically a qualified injured worker." AR 348-356.

In December 2010, Dr. Karvelas completed a check-the-box and fill-in-the-blank form setting forth his assessment of Plaintiff's functional capacity and concluded that because Plaintiff had "limited tolerance for repetition, prolonged or extreme posturing," he was limited as follows: (1) lifting and/or carrying no more than thirty pounds, ten pounds frequently and twenty pounds occasionally; (2) sitting less than four hours in an eight-hour workday; (3) standing and/or walking less than four hours in an eight-hour workday; (4) repetitive pushing/pulling for no more than two to four hours per day; (5) never crawling; (6) occasional climbing, balancing, stooping, kneeling, twisting, reaching and crouching; (7) frequent fingering, feeling, seeing, hearing and speaking; and (8) avoiding heights. AR 291. Dr. Karvelas referred Plaintiff to Randall E. Seago, M.D., of Spinal & Orthopaedic Surgery.

At a June 2011 spine surgery consultation, Dr. Seago observed Plaintiff remaining "seated throughout the lengthy interview process" and rise from his "chair with some guarding." His "gait has a short stride but is otherwise unremarkable." Dr. Seago obtained an MRI of Plaintiff and upon review diagnosed him with: (1) left sciatica, (2) moderate to marked left L5-S1 foraminal stenosis involving the left L5 nerve root; (3) retrolisthesis at L5-S1 with a broad-based midline disc protrusion; and (4) grade I spondylolisthesis at L4-5 on forward bending views. Dr. Seago explained that "instability at L4-5 on forward bending combined with retrolisthesis at L5-S1 and the associated foraminal stenosis with disc protrusion are such that standing/weight bearing will certainly worsen his symptoms." He recommended "electrodiagnostic studies to be performed by Dr. Karvelas." AR 251-255. Dr. Seago expressed general agreement with the attending physician who conducted the MRI scan, Murray Solomon, M.D., at Insight Imaging. Dr. Solomon's separate findings included: "no marked congenital or marked acquired <u>central</u> canal narrowing at any lumbar level." However,

"[e]xamination of the lumbar disc levels reveal[ed] disc disease and/or degenerative change at the L3-4, L4-5 and L5-S1 disc levels." AR 324 (emphasis in original).

Concurrent to seeing Dr. Karvelas, Plaintiff also saw Ray Hsieh, M.D. at Pain Care of Silicon Valley on a regular basis from July 2009 to July 2013. AR 366-400, 486-501, 504-507, 514-517, 523-524. Plaintiff received facet and epidural injections about every few months until March 2012. AR 234-250, 401-412, 508-513, 518-520. On a number of occasions, namely in January, February and April 2012, he expressed feeling a decrease in low back and left leg pain from the injections. In April 2012, he reported experiencing "approximately 80-90% reduction in his low back and left leg pain as a result of the injections" and "enjoying increased functional capacity as a result of the improvement, and he has been able to decrease his as-needed pain medication[,]" despite "not [having] had any acupuncture lately[.]" AR 366-371. In the same month, Dr. Hsieh completed a physical RFC questionnaire, a check-the-box and fill-in-the-blank form.[3] Therein, he diagnosed Plaintiff with lumbar radiculopathy, lumbar facet arthropathy, and cervical radiculopathy. Plaintiff had pain in the neck, low back, and left leg, which increased with activity such as lifting, standing, and walking. Dr. Hsieh concluded Plaintiff was not a malingerer and that emotional factors did not contribute to his symptoms and functional limitations. Plaintiff experienced pain at a constant level such that it would interfere with the attention and concentration needed to perform even simple work tasks. Plaintiff's medications caused drowsiness, dizziness, and impaired cognition. He could: (1) walk three city blocks without rest or severe pain; (2) sit for about thirty minutes before needing to get up; (3) stand for about thirty minutes before needing to sit down or walk around; (4) sit for less than two hours in an eight-hour workday; (5) and stand/walk for less than two hours in an eight-hour workday; (6) rarely lift and carry ten pounds or less in a competitive work environment; and (7) never twist, stoop, crouch and climb ladders or stairs. Additionally,

---

[3] The questionnaire is a poor copy and therefore partly illegible.

Plaintiff required: (1) a sit/stand option; (2) periods of ten-minute walks every fifteen minutes; and (3) unscheduled lengthy breaks often. He would be absent from work for more than four days per month. AR 361-364.

In January 2012, medical consultant M. Gleason, M.D., reviewed Plaintiff's medical records and opined he: (1) could lift and/or carry twenty pounds occasionally and ten pounds frequently; (2) could sit, stand and/or walk about six hours in an eight-hour workday; (3) was limited with pushing/pulling of the upper and lower left extremities; (4) could occasionally climb ramps and stairs, stoop, kneel, crouch and crawl; (5) frequently balance; (6) never climb ladders, ropes or scaffolds; and (7) was limited with reaching left overhead, left front and/or laterally. According to Dr. Gleason, a finding of light RFC "is not unreasonable." He reviewed Dr. Karvelas's December 2010 assessment and noted the finding that Plaintiff could sit and stand less than four hours in eight-hour workday to be unsupported by objective evidence, pointing to the fact that "on 9/6/11 is the statement that there has been a 70% pain reduction indicating a good response to cortisone injections."[4] Dr. Gleason found Dr. Karvelas's opinion:

- "relie[d] heavily on the subjective report of symptoms and limitations provided by [Plaintiff], and the totality of the evidence does not support the opinion[;]"
- "contains inconsistencies, rendering it less persuasive[;]" and
- "without substantial support from other evidence of record, which renders it less persuasive."

Dr. Gleason believed that despite Plaintiff's limitations, he could perform his past relevant work as bartender as it is generally performed in the national economy. AR 54-58.

About eight months later, another medical consultant, C. Bullard, M.D., also reviewed Plaintiff's medical records and found his statements about the intensity, persistence, and functionally limiting effects of the symptoms unsubstantiated by the objective medical evidence alone, and that he was only "partially credible" because while he reported being disabled, "all objective findings in

---

[4] A review of the record show Plaintiff made the statement on August 2, 2011 and not "9/6/11" as Dr. Gleason noted. AR 285.

file would support [normal] gait and light work restrictions." Dr. Bullard found Dr. Hsieh's opinions in the April 2012 questionnaire "overly restrictive given the recent improvement from the steroid injections. [For example,] EPS injections in the cervical spine was [*sic*] performed on 7/20/11 with 90% improvement in pain on [follow-up] of 10/3/11." And there was an "80% reduction in his back pain since his [epidural steroid] injections performed on 10/12/11." In sum, Dr. Bullard opined that the evidence supports adopting Dr. Gleason's "prior determination of Light RFC w/ limitations." AR 67-71, 370, 372.

In an October 2012 letter written on Plaintiff's behalf in support of his claim for disability from the work-related injury, Dr. Hsieh stated:

> [Plaintiff] takes medications as needed on a slightly regular basis to manage his pain, and this would also render it difficult to impossible for him to perform job-related duties because of the potential cognitive side effects of medications. Although he does have some improvement with treatment that is performed including medications, rehabilitative modalities, acupuncture, and epidural steroid injections, these are things that are done on a regular basis chronically for maintenance purposes. I do believe that it is unlikely to expect that Mr. McMahon's condition would suddenly revert to the point where he has little to no pain and is able to resume a full gamut of his previous capacity for activities. Therefore, I do believe that disability is appropriate at this time.

AR 502.

From December 2011 to March 2013, Plaintiff received nearly monthly acupuncture therapy at Sierra Acupuncture from Taya Stanley, D.A.O.M. The result, according to Plaintiff, was an overall reduction in pain. In August 2012, he reported, "overall clear decrease in pain intensity, both at rest and with exertion in the lumbar as well as cervical area[,]" "radiculopathy down [the] left leg is retreating (less numbness in toes)[,]" and "a significant pain and paresthesia reduction of the cervicalgia pain syndrome which initially radiated over left scapula area and down dorso-lateral left arm[,]" with "improved life quality and daily activities levels regarding range and duration." Two months later, he reported similar improvements. In December 2012, he reported that "after the

present acupuncture course his life quality and the range of daily activities improved due to the increase in lumbar range of motion and due to less frequent and less intense lumbar pain and flare-ups." These improvements led Dr. Stanley to conclude that acupuncture was beneficial to Plaintiff and should continue. AR 447-464, 471, 480-483.

2. <u>Plaintiff's Written Testimony</u>

In his first disability report, completed in October 2011, Plaintiff stated injuries to his cervical and lumbar spine and left leg limited his ability to work. He was, at the time, taking various medications to help alleviate the back and leg pain. Plaintiff last worked as a tow truck driver, a job he held from October 2003 to July 2008. Before that, he worked as a health care provider from July 2002 to August 2003 and as a bartender from December 1998 to June 2002. AR 149-152, 161.

In December 2011, Plaintiff completed an exertion questionnaire. Therein, he reported being active, on average, for about three hours a day, with the remainder being consumed by worsening pain. He could walk for about a third of a mile or half an hour before his knee swells. He could climb a flight of stairs in his apartment and lift no more than twenty pounds. He could lift a basket of laundry up the stairs, but not without increased pain. He did no yard work but could, in fifteen-minute increments, perform housework including dishwashing, vacuuming, and cleaning the bathroom. He could drive for no more than thirty minutes and went grocery shopping every three weeks. He usually gets about two to four hours per night of "broken" sleep and therefore napped during the day for about thirty minutes to an hour. Plaintiff used a brace daily for stability. His medications included: Gabapentin, Ultracet, Metaxalone, and Dendracin. AR 158-160.

In his second disability report, completed in March 2012, Plaintiff reported "[w]orsening of [low back pain], throbbing pain top of foot, cervical strain, flaring neck pain, standing limited." His medications remained the same, with fatigue and loss of energy being side effects. AR 169, 171. And in his third disability report, completed in September 2012, Plaintiff reported "increase in leg

pain . . . when standing, walking, lifting, [and] bending." His medications remained largely the same. AR 176, 178.

### 3. Hearing Before Administrative Law Judge

At the hearing in April 2013, Plaintiff confirmed his impairments included neck and back pain which extended down the left side of his leg and ankle. AR 34. He testified that acupuncture worked well to relieve some of the pain. It allowed him to walk as much as thirty minutes, sit for about forty-five minutes to an hour, and stand for about thirty minutes. Without the acupuncture, he would be lying down most of the time with a pillow underneath his legs. AR 36.

He had a driver's license. He could lift a gallon of milk and was able to bathe and dress himself. He cleaned the bathroom, bedroom, went grocery shopping once a month with his mother and sometimes on his own, watched television and played video games. He tried to exercise daily for about ten to fifteen minutes. AR 36-38.

Plaintiff used a back brace and TENS unit. On average, he had about six to seven good says a month. His medications—Gabapentin, Ultracet, Metaxalone, and Vicodin—caused Plaintiff to feel disconnected and dizzy when walking. Relief from the epidural steroid injections lasted from two weeks to a month and a half. He did not undergo surgery because a surgeon advised him that there was only fifty percent chance of removing fifty percent of the pain. AR 36-37, 39-41.

### 4. ALJ's Decision

A claimant is disabled under Titles II and XVI if he is unable to engage in substantial gainful activity because of a medically determinable physical or mental impairment that can be expected to result in death or has lasted or can be expected to last for a continuous period of no less than twelve months. 20 C.F.R. §§ 404.1505(a), 416.905(a). To encourage uniformity in decision making, the Commissioner has promulgated regulations prescribing a five-step sequential process which an ALJ

must employ to evaluate an alleged disability.[5]

In his written decision, the ALJ found that at step one, Plaintiff had not engaged in substantial gainful activity since the alleged onset date of July 18, 2008. At step two, Plaintiff had the following severe impairments: degenerative disc disease of the cervical spine and lumbar degenerative disc disease with left-sided radicular pain. At step three, Plaintiff did not have an impairment or combination of impairments that medically met or equaled the severity of a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1. Plaintiff had the RFC to perform light work, except he: (1) cannot climb ladders, ropes or scaffolds; (2) occasionally climb ramps and chairs, balance, stoop, kneel, crouch and crawl; (3) must avoid all use of hazardous machinery and all exposure to unprotected heights; and (4) is limited to simple repetitive tasks. At step four, Plaintiff was incapable of performing any of his past relevant work. At step five, however, there were jobs in the national economy, namely cashier and marker, which Plaintiff could perform. Consequently, the ALJ concluded Plaintiff was not disabled as defined under the Act since July 18, 2008 through the date of the decision. AR 17-24.

## II. DISCUSSION

A. *Legal Standards*

This Court reviews the Commissioner's final decision to determine if the findings are supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence means "more than a mere scintilla" (*Richardson v. Perales*, 402 U.S. 389, 401 (1971)), but "less than a preponderance." *Sorenson v. Weinberger*, 514 F.2d 1112, 1119 n. 10 (9th Cir. 1975). It is "such relevant evidence as

---

[5] "In brief, the ALJ considers whether a claimant is disabled by determining: (1) whether the claimant is doing substantial gainful activity; (2) whether the claimant has a severe medically determinable physical or mental impairment or combination of impairments that has lasted for more than 12 months; (3) whether the impairment meets or equals one of the listings in the regulations; (4) whether, given the claimant's residual functional capacity, the claimant can still do his or her past relevant work; and (5) whether the claimant can make an adjustment to other work. The claimant bears the burden of proof at steps one through four." *Molina v. Astrue*, 674 F.3d 1104, 1110 (9th Cir. 2012).

a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401. "If the evidence can reasonably support either affirming or reversing a decision, we may not substitute our judgment for that of the Commissioner.  However, we must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion, and may not affirm simply by isolating a specific quantum of supporting evidence." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (internal citation and quotations omitted).  "If the evidence can support either outcome, the Commissioner's decision must be upheld." *Benton v. Barnhart*, 331 F.3d 1030, 1035 (9th Cir. 2003); *see* 42 U.S.C. § 405(g) (2010).  But even if supported by substantial evidence, a decision may be set aside for legal error. *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009).

Moreover, an ALJ's error is harmless "when it was clear from the record that [the] error was inconsequential to the ultimate nondisability determination." *Robbins v. Soc. Sec. Admin*. 466 F.3d 880, 885 (9th Cir. 2006).

B. *Analysis*

On appeal, Plaintiff contends the ALJ erred: (1) in failing to properly consider listing 1.04, (2) in rejecting the opinions of Dr. Karvelas, and (3) in rejecting the opinions of Dr. Hsieh.

a. Listing 1.04

Plaintiff avers his conditions met the requirements of listing 1.04 and that by "only provid[ing] a boilerplate conclusion that Plaintiff's spinal disorders do not meet or medically equal a listed impairment," the ALJ erred.  Doc. 19, p. 11.  The Commissioner counters Plaintiff did not meet his burden of showing he met listing 1.04.

Listing 1.04 states in relevant part:

> Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:

> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)[.]

20 C.F.R. § Pt. 404, Subpt. P, App. 1.  This means to establish a spinal disorder under listing 1.04, subpart A, a claimant must establish a spinal disorder and present evidence of nerve root compression illustrated by (1) limited spinal motion, (2) motor loss with sensory or reflex loss, and (3) if the lower back is involved, positive straight-leg raising test.  *Id.*; *see Healy v. Astrue*, 379 F. App'x 643, 645 (9th Cir. 2010).[6]  Moreover, underlying a disorder of the musculoskeletal system is the requirement of "functional loss," which is "defined as the inability to ambulate effectively on a sustained basis for any reason[.]"  20 C.F.R. § Pt. 404, Subpt. P, App. 1.  And the

> [i]nability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning . . . to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities.

*Id.*

In support of his alleged disability under listing 1.04, Plaintiff asserts: (1) the "MRI exams confirm . . . multiple herniated discs, foraminal stenosis, and annular tears in [the] lumbar spine impinge nerve roots on at least two different vertebral levels[;]" (2) "multiple physicians have consistently diagnosed [him] with lumbar radiculopathy based on objective diagnosis[;]" (3) "physicians have repeatedly noted restricted range of motion in the lumbar spine[;]" (4) "physicians have repeatedly confirmed Plaintiff exhibits numbness and loss of sensation in his leg and calf and left sided 'sensory disturbances' and 'deficits[;]'" and (5) he "exhibits" a positive straight leg raise

---

[6] This unpublished decision is citable under Rule 32.1 of the Federal Rules of Appellate Procedure.  *See also* 9th Cir. R. 36–3(b).

test[.]" He cites to the opinions of Drs. Seago, Karvelas, Solomon, and Hsieh. Doc. 19, pp. 11-12. But a review of their opinions shows Plaintiff cannot meet his burden.

Importantly, the evidence belies an inability to ambulate effectively on a sustained basis. For example, Dr. Seago observed Plaintiff remaining "seated throughout the lengthy interview process" and rise from his "chair with some guarding." His "gait has a short stride but is otherwise unremarkable." He appeared at the initial consultation with Dr. Karvelas "with a normal reciprocating gait pattern and normal station." And while Plaintiff alleged worsening pain in March and September 2012, his December 2011 exertion questionnaire states Plaintiff could walk for about a third of a mile or half an hour, perform house cleaning in fifteen-minute increments, and drive for no more than thirty minutes. Further, he testified at the April 2013 hearing that acupuncture allowed him to walk for as long as thirty minutes. Collectively, these activities do not reflect an inability to ambulate effectively on a sustained basis. Failing to meet the requirement of functional loss, Plaintiff cannot therefore successfully argue that he suffers from the type of spinal disorder contemplated by listing 1.04. *See Bennett v. Colvin*, 609 F. App'x 522 (9th Cir. 2015) ("the ALJ was not required to explain why Bennett's impairments do not equal Listing 1.04, because Bennett did not present evidence in an effort to establish medical equivalence") (citations omitted).

Finding, then, that Plaintiff did not satisfy the foundational requirement of listing 1.04, the Court need not discuss whether he has met the remaining requirements.

    b. <u>Dr. Brian Karvelas</u>

The ALJ recounted Dr. Karvelas's December 2010 assessment and stated:

> Dr. Karvelas treated the claimant for more than two years and examined him on multiple occasions, and his opinions are partially consistent with the medical evidence. The restrictions he identifies in lifting, carrying, performing most postural tasks, and interacting with heights are generally supported by the evidence for the reasons set forth above, while those he describes in sitting, standing, and walking are not.

13

AR 22.  From this, Plaintiff avers the ALJ "failed to provide any reasons at all for rejecting Dr. Karvelas' [*sic*] opinion" that Plaintiff could not stand and sit a total of four hours each in an eight-hour workday.  Doc. 19, p. 12.  He asserts the ALJ was required to provide specific and legitimate reasons but instead gave a generalized and unexplained conclusion which prejudiced Plaintiff.  The Commissioner contends the ALJ properly considered Dr. Karvelas's opinions and the decision to give less weight to portions thereof find support in the record.

"As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995) (footnote and citation omitted).  To reject a treating physician's opinion which is contradicted by another physician, the ALJ must provide specific and legitimate reasons supported by substantial evidence in the record.  *Id*.  But an "ALJ need not accept the opinion of any physician, including a treating physician, if that opinion is brief, conclusory, and inadequately supported by clinical findings." *Chaudhry v. Astrue*, 688 F.3d 661, 671 (9th Cir. 2012) (quotations and citation omitted).  Because Dr. Karvelas's opinions concerning Plaintiff's capacity to sit, stand and walk is contradicted by Drs. Gleason and Bullard, the ALJ was required to provide specific and legitimate reasons in discounting them.

Plaintiff's assertion that the ALJ provided no reasons at all is specious.   In referencing "the reasons set forth above," the ALJ necessarily included his discussion of the opinions of Drs. Pang, Seago, Gleason, Bullard, and Plaintiff's own statements of decreased pain and improved range of motion. The ALJ explained that despite multiple abnormalities, Plaintiff walked with a normal gait and that his pain was alleviated with facet and epidural steroid injections and acupuncture, as shown by the physicians' opinions and Plaintiff's statements to Drs. Hsieh and Stanley.  Indeed, the ALJ's reasoning finds substantial support in the record.  And from them, he could reasonably infer that it was unreasonable to find Plaintiff could not sit and stand/walk for four hours each in an eight-hour

workday.  *See*, *e.g.*, *Gen. Ship Serv. v. Dir., Office of Workers' Comp. Programs*, 938 F.2d 960, 962 (9th Cir. 1991) ("ALJs must draw reasonable inferences based on the evidence before them.")

The ALJ's statement that "no treating or examining clinician has ever observed him to appear uncomfortable while sitting, standing or walking" is arguably inaccurate, given that Dr. Hsieh concluded in the April 2012 questionnaire that Plaintiff's pain increased with lifting, standing, and walking.  AR 20.  However, any error here was harmless where the ALJ also correctly relied on Plaintiff's statements of decreased pain and increased functional capacity from the injections.  Moreover, the ALJ ultimately gave Dr. Hsieh's opinion little weight.  AR 22-23.

To conclude, then, that the ALJ gave no specific and legitimate reasons for partially rejecting Dr. Karvelas's opinion, Plaintiff would have the court read the ALJ's decision in a piecemeal fashion, and that it will not do.

### c. Dr. Ray Hsieh

With regard to Dr. Hsieh, the ALJ stated in pertinent part:

> Although Dr. Hsieh has examined the claimant many times, his opinions are not consistent with the medical evidence, including his own treatment notes.  The claimant has a greater capacity for sitting, standing, walking, lifting, carrying, and performing postural tasks than Dr. Hsieh found for the reasons explained previously.  In addition, while the claimant has testified that he has a limited tolerance for activity and must rest frequently throughout the day, the observations of treating and examining doctors do not support this claim.  No clinician has observed him to appear particularly tired, or to have difficulty functioning during appointments.  Likewise, no doctor has ever observed the claimant to have substantial difficulty maintaining attention or concentration, and he remains able to drive and handle his own medical care.  This suggests that he should be capable of performing simple tasks on a regular basis.  Finally, Dr. Hsieh's opinion is quite speculative.  He indicates that the claimant's medication used could cause cognitive difficulties that would interfere with his ability to perform work activities.  Yet, he does not actually state that the claimant experiences such difficulties, and there is no evidence in his treatment notes that he has observed such problems.  The medical evidence conflicts with Dr. Hsieh's opinions; thus, the undersigned must give them little weight.

AR 23. Plaintiff avers the ALJ's reasons for rejecting Dr. Hsieh's opinions are "baseless, unsupported by substantial evidence, and do not constitute specific and legitimate reasons." Doc. 19, p. 15. The Commissioner contends the ALJ properly gave little weight to Dr. Hsieh's opinions. Because Dr. Hsieh was a treating physician, whose opinions were contradicted, the ALJ was required, as he did with Dr. Karvelas, to provide specific and legitimate reasons for rejecting them. *Lester*, 81 F.3d at 830.

While not a model of clarity, the ALJ's written decision essentially rejects Dr. Hsieh's opinion: (1) concerning Plaintiff's capacity for sitting, standing, walking, lifting, carrying, and performing postural tasks; (2) concerning Plaintiff's need for lengthy unscheduled breaks; (3) that Plaintiff's severe pain interfered with his ability to perform simple work tasks; and (4) that medication side effects made it difficult for Plaintiff to perform job-relate duties.

First, because Dr. Hsieh's opinion concerning Plaintiff's sitting, standing and walking capacity were more restrictive than Dr. Karvelas's, the ALJ's expressed reasons for rejecting the latter's opinion applies here with equal force. As for Plaintiff's capacity to lift and carry, the ALJ explained in his decision that Plaintiff "retains full strength in most muscle groups[.]" AR 21. This is supported by Dr. Pang's observation of no visible muscle atrophy of the upper or lower extremities and no visible intrinsic muscle atrophy of the hand muscles. It is also supported by Plaintiff's written testimony that he could lift as much as twenty pounds.[7] The ALJ could therefore reject Dr. Hsieh's opinion that Plaintiff could only rarely lift and carry ten pounds at most. As for the Plaintiff's capacity to perform postural tasks, the ALJ adopted the opinions of Drs. Gleason and Bullard, which were less restrictive than Dr. Hsieh's with regard to stooping, crouching and climbing stairs. And Plaintiff does not dispute their opinions.

---

[7] The Court finds no evidence in the record of Plaintiff's testimony that he could "lift 16 pounds," as the ALJ stated in his written decision. AR 21.

Second, the ALJ rejected the opinion that Plaintiff needed lengthy unscheduled breaks because no physician "observed him to appear particularly tired, or to have difficulty functioning during appointments[,]" or "difficulty maintaining attention or concentration." The ALJ also noted the fact that Plaintiff was "able to drive and handle his own medical care." AR 22. From these, the ALJ could infer that the need for lengthy unscheduled breaks were unfounded. *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012) ("Even when the evidence is susceptible to more than one rational interpretation, we must uphold the ALJ's findings if they are supported by inferences reasonably drawn from the record."). And for these same reasons, along with his treatment regimen and reported statements of decrease pain, the ALJ could infer that Plaintiff's pain was not so severe as to prevent him from performing even simple work tasks.

Finally, the ALJ's reason for rejecting the opinion that medication side effects made it difficult for Plaintiff to perform job-relate duties—that it was speculative—is supported by substantial evidence. Dr. Hsieh rendered his opinion in his October 2012 letter written in support of Plaintiff's workers' compensation claim, and on its face the letter states the difficulty could arise "because of the potential cognitive side effects of medications." The problem, however, as the ALJ correctly explained, is these side effects and resulting difficulty are not evident in the record. The ALJ is correct that while Plaintiff testified to feeling dizzy and disconnected from his medications, there is no record of him reporting these alleged side effects to a treating physician. As for Plaintiff's written testimony of fatigue and energy loss, they, too, were not reported to a treating physician, and are not cognitive side effects contemplated by Dr. Hsieh.

Thus, even if the ALJ's reasons for rejecting part of Dr. Hsieh's opinions are not the most convincing and articulately expressed, the Court would be hard pressed to conclude no specific and legitimate reasons were given.

## III. CONCLUSION

Accordingly, the Court DENIES Plaintiff's appeal from the administrative decision of the Commissioner of Social Security.  The Clerk of Court is DIRECTED to enter judgment in favor of the Commissioner and against Plaintiff, Nickolas W. McMahon.


IT IS SO ORDERED.

    Dated:   **October 20, 2016**          **/s/ Sandra M. Snyder**
                                                      UNITED STATES MAGISTRATE JUDGE